F.   The Consultants/Enrollers and The Marketing of the Plan as Health Insurance.

133. The Plan hired and paid "general consultants" and "enrollers" to market and sell participation in the Plan to employers and individual participants.

134. Individuals and/or small groups were recruited to join the Union and the Plan by these so-called "general consultants" and "enrollers."

135. "General consultants" marketed and enrolled new subscribers in the Plan.

136. "Enrollers" worked for general consultants, but also marketed the Plan and enrolled new subscribers in the Plan.

137. The so-called "general consultants" and "enrollers," who marketed the Plan as low-cost insurance to individuals, were paid commissions from amounts collected from participants they placed in the Plan.

138. The so-called "general consultants" and "enrollers" who marketed the Plan were in fact nothing more than insurance agents or salespersons. In fact, many of the Consultants/Enrollers operated insurance companies at the same time they were Consultants/Enrollers for the Plan.

139. The Plan was marketed to employers and potential participants by "general consultants" and "enrollers," including

the Consultants/Enrollers, as a health insurance plan for such employees and potential participants.

140. On information and belief, each Consultants/Enroller entered into a written IUIIW Organizer Agreement with the Union that required the Consultants/Enroller to act as an organizer for the Union and required the Consultants/Enroller to do activities related to organizing and operating union shops at employers for the Union. No compensation of any form or type was required to be paid to the Consultants/Enrollers under the IUIIW Organizer Agreements.

141. On information and belief, each Consultants/Enroller entered into a written General Consultant Agreement with the Plan at the same time they entered into the IUIIW Organizer Agreement. The General Consultant Agreement required the Consultants/Enrollers to solicit new participants in the Plan and required the Plan pay the Consultants/Enrollers "service fees" for "in-force membership contributions" to the Plan based on a service fee schedule and based on the number of participants in the Plan solicited by the Consultants/Enroller or by other Consultants/Enrollers working as sub-agents for the Consultants/Enroller.

142. Plan participants solicited by the Consultants/Enrollers were permitted to become members of the

43

Union regardless of whether they were employed or not, regardless of whether collective bargaining agreements were used or entered into related to their membership, and regardless of whether any union activities were performed or involved in relation to their membership in the fake Union. Participants were granted membership or beneficial membership in the Union (and thus paid Union dues) to make those persons eligible for health insurance coverage by the Plan.

143. Consultants/Enrollers would market the Plan as health insurance to persons via the distribution of information about the Plan while making little or no attempt to perform Union related activities such as organizing union employees at an employer or encouraging persons to become Union members because of the Union related activities that could be performed on their behalf by the Union.

144. The Consultants/Enrollers were marketing the Plan as health insurance instead of performing Union related organization activities, such as organizing union employees at an employer or encouraging persons to become Union members because of the Union related activities that could be performed on their behalf.

145. The Plan's Consultants/Enrollers knew or should have known that they were marketing the Plan primarily as health

44

insurance that stood on its own instead of as health insurance that was a benefit of membership in the Union. These Consultants/Enrollers also knew or should have known that Union dues would be collected from each person they signed up as a member or beneficial member of the Plan.

146. Consultants/Enrollers were not concerned with organizing Union membership or providing Union related activities or benefits for the persons they solicited. Consultants/Enrollers were concerned instead with signing up persons as beneficial members of the Plan to increase Plan participation which, in turn, would increase their own earnings from such Plan participation.

147. Instead of the Consultants/Enrollers performing Union organization activities, Consultants/Enrollers were encouraged and compensated to work diligently to increase Plan participation and bring in more Plan members. The Consultants/Enrollers were encouraged to do this so that funds could be obtained from such new participants and then used to pay old and existing Plan claims. This propagated the pyramid nature of the scheme.

148. This scheme was implemented to obtain and collect Plan assets as alleged union dues and premium contributions to pay funds to, among others, the Consultants/Enrollers as commissions

and to pay funds to IUPIW, IUPIW Canadian Benefit Fund, and George Beltz.

G.   The Plan's Third Party Administrator.

149. Oak Tree Administrators, Inc. ("OTA") was the Plan's sole third party administrator ("TPA") at all relevant times between June 1, 2000 and June 2003.   OTA performed certain, limited TPA duties for the Plan after June 2003.

150. As the Plan's collections agent, OTA would collect payments from employers of employees who were Plan members, from employer associations and/or from Plan participants themselves.

151. Monies collected by OTA were Plan assets under the governing Plan documents.

152. Plan "beneficial members" or their employers, if any, generally paid their premiums to OTA who deducted a percentage of the premiums as fees and remitted the remainder to the Union and to the Plan.

153. Substantial sums of Plan assets, in the amount of millions of dollars, flowed through OTA.

154. With the Plan assets it received, OTA also paid the Consultants/Enrollers their commission payments, paid the alleged dues payments to the Union, and paid IUPIW or its health insurance welfare benefit fund, the IUPIW Canadian Benefit Fund.

155. As of June 2003, OTA paid Plan assets to Consultants/Enrollers in the approximate total amount of $1,670,622.57. All of these funds came from the contributions paid by Plan participants.

156. As of June 2003, OTA had paid at least $91,286 to IUPIW or its health insurance welfare benefit fund, the IUPIW Canadian Benefit Fund. Likewise, all of these funds came from the contributions paid by Plan participants.

H.    Lack of Underwriting Regarding the Plan.

157. A key requirement for the financial health and continued survival of a health insurance plan, particularly a self-funded or partially self-funded one, is the performance of proper underwriting so that the population of the plan is not too "high risk" for the plan.

158. The financial health of an insurance plan depends, in large measure, upon meaningful underwriting to avoid adverse selection. Adverse selection, in the health insurance industry, is the accumulation of persons with both more health problems and more severe health problems who, thus, present higher risks of payment to an insurer. Insurers attempt to prevent adverse selection by use of an underwriting process, which is the process of selecting and classifying exposures and declining to provide coverage to certain defined high-risk persons. The only

47

time that meaningful underwriting is not required is when a large enough group is insured as a group because a large enough group would include a natural dispersion of risks, both high and low.    However, if a group is not sufficiently large, such as if individuals or small groups are allowed to join or to constitute a plan, as was the case with the Plan, underwriting must be done to prevent adverse selection.

159. Thus, a key requirement for the financial health and continued survival of a health insurance plan is the performance of proper underwriting so that the population of the plan is not too high risk for the Plan.    In other words, unless some discrimination of Plan participants is done to prevent enrollment of high cost claims such as persons with major or chronic medical conditions, the Plan will have to pay a large amount of high claims, resulting in decreased financial health and eventually insolvency of the Plan.

160. There was no material, consistent or effective underwriting of the Plan's self-funded program because no one screened potential Plan participants for major or chronic medical conditions.

161. Although the Consultants/Enrollers exercised great latitude in deciding whether or not an applicant should be accepted, they performed no material or effective underwriting,

including that they did not deny coverage to persons above a certain age or with major or chronic medical problems.

162. On information and belief, the Plan Trustees, the Union, and OTA relied on the Consultants/Enrollers to perform underwriting for the Plan, including the decision to deny coverage to persons above a certain age or with major or chronic medical problems. The Consultants/Enrollers were to accomplish this underwriting by recruiting all employees at an employer to be in the Union. This would prevent adverse selection by ensuring that diverse groups of persons with a cross-section of health and medical issues were placed in the Plan.

163. For the most part, the Consultants/Enrollers did not recruit entire employer groups to be members of the Union. Instead, the Consultants/Enrollers primarily sold the Plan as health insurance and signed up individuals to the Plan. The Consultants/Enrollers did so because they had a single motivation when seeking new Plan participants, i.e., to add Plan participants and put business on the books of the Plan so that their personal commission payments would increase.

164. The Consultants/Enrollers were motivated to add participants to the Plan and not to underwrite the new participants in the Plan because the Consultants/Enrollers, via their contractual arrangements with the Plan, were compensated

for the quantity of Plan participants they signed up to the Plan.

165. Through these actions by the Consultants/Enrollers, the Plan became relatively low cost health insurance available to high-risk and high-claim cost individuals who took advantage of the opportunity to obtain relatively low cost health insurance via the Plan.

166. The inadequate underwriting of the Plan caused a number of high-risk and high-claim cost individuals to be members of the Plan and caused numerous high-cost claims to be incurred by the Plan.

167. The inadequate underwriting of the Plan, along with the Plan having insufficient funds from premium payments, resulted in the Plan having claims in excess of funds available to pay pending claims.

168. The Plan's insufficiency of funds to pay such claims caused a backlog of numerous claims that were not paid.

I.   Improper Receipt and Use of Funds by IUPIW and IUPIW Canadian Benefit Fund.

169. The Plan and IUIIW entered into an alleged oral affiliation agreement with the IUPIW and IUPIW Canadian Benefit Fund in June 2000.

170. The alleged oral affiliation agreement between the Plan/IUIIW and the IUPIW/IUPIW Canadian Benefit Fund continued until April 15, 2002.

171. Under the alleged oral affiliation agreement between the Plan/IUIIW and the IUPIW/IUPIW Canadian Benefit Fund, Plan assets were paid to Defendants IUPIW, IUPIW Canadian Benefit Fund, and George Beltz.  Such payments were denoted as payments for dues to the IUPIW and for premium payments to insurance carriers.   Such payments were allegedly in exchange for including IUIIW Plan members in fully-insured health insurance coverage offered through the IUPIW Canadian Benefit Fund.

172. The alleged oral affiliation agreement between the Plan/IUIIW and the IUPIW/IUPIW Canadian Benefit Fund was supposedly terminated via letter on April 15, 2002.

173. Notwithstanding the supposed termination of the oral affiliation agreement between the Plan/IUIIW and the IUPIW/IUPIW Canadian Benefit Fund on April 15, 2002, the Plan continued to make payments to the IUPIW/IUPIW Canadian Benefit Fund/George Beltz for purported dues and for insurance carrier premiums between April 2002 and September 2004.

174. On November 1, 2002, IUIIW and IUPIW entered into a written affiliation agreement by which Plan assets were paid to IUPIW/IUPIW Canadian Benefit Fund/George Beltz for alleged

51

premium payments to insurance carriers.   Such payments were allegedly in exchange for including IUIIW Plan members in fully-insured health insurance coverage offered through the IUPIW Canadian Benefit Fund.

175. Substantial amounts of Plan assets have been paid to IUPIW//IUPIW Canadian Benefit Fund/George Beltz for these alleged premium payments.

176. In addition to the alleged premium payments, Plan assets have been paid as "dues" to the IUPIW.   As of June 2003, Plan assets totaling $91,286 had been paid to IUPIW and George Beltz as alleged dues to IUPIW.

177. Additional Plan assets were paid to IUPIW and George Beltz as alleged dues to IUPIW between June 2003 and September 2004.

J.   Deleterious Effects on the Plan and Plan Participants.

178. The financial health of the Plan decreased based on the above-described actions of the Defendants to the point where the Plan was unable to pay claims or ensure that claims were paid.

179. Notwithstanding the Plan's severe problems in paying claims, the Consultants/Enrollers continued to recruit participants to join the Plan and continued to take their commissions.   Indeed, they recruited new participants

specifically for the purpose and with the intention of using the monies paid by the new participants to pay old, existing claims.

180. Though their efforts to "recruit" new Union members, which by enlarge were merely efforts to sell health insurance to individuals who otherwise could not obtain coverage elsewhere, the Consultants/Enrollers charged and received payments/ commissions from funds rightfully belonging to the Plan. They also obliged the Plan to cover insurance claims of individuals who were high-risk. In many instances, while a particular Consultant/Enroller may not have received large amounts of commissions, his or her actions were nevertheless extremely injurious to the Plan because of the claims presented by the participants that particular Consultant/Enroller "recruited" into the Plan.

181. Under their agreements with the Plan, the Consultants/Enrollers focused their activities related to the Plan merely on adding new Plan participants without focusing any efforts on or paying any attention to Union organization activities, the underwriting of Plan participants, the risk being borne by the Plan related to such participants or the ability of the Plan to pay the self-funded claims of such participants.

182. As of June 30, 2003, the Plan had unpaid claims totaling $2,382,812.55.

183. As of April 2004, the Plan had unpaid claims totaling at least $6,489,099.17.

184. The Plan's act of not paying claims had severe and sometimes devastating effects on Plan participants.

185. Because claims were not being paid, Plan participants were complaining to the Plan.   These complaints were numerous and continuous.   Some participants also complained to state and federal government regulators.

K.    Action by State and Federal Government Regulators.

186. The lack of payment of claims resulted in numerous complaints by Plan participants to state insurance regulators regarding the Plan's failures to pay claims as promised and required.

187. The spiraling unpaid health insurance claims of the Plan drew the attention of various state departments of insurance.   The lack of payment of claims resulted in numerous complaints to state insurance regulators, who, in turn, would send information requests to the Plan.

188. On August 9, 2001, the Oklahoma Insurance Commissioner found the Plan to be subject to regulation by the Oklahoma insurance department, asserted jurisdiction over the Plan, and

ordered that the Plan's operators cease and desist all insurance related activities in the state.

189. On January 10, 2002, the Texas Department of Insurance asserted jurisdiction over the Plan and made an inquiry for information regarding the Plan.

190. On January 31, 2002, the Alabama Insurance Commissioner found the Plan to be subject to regulation by the Alabama insurance department, asserted jurisdiction over the Plan, and ordered that the Plan's operators cease and desist all insurance related activities in the state.

191. On August 23, 2002, John Canary of the U.S. Department of Labor sent a letter to Commissioner John W. Oxendine of the Georgia Department of Insurance that stated, among other things, that the Plan was subject to concurrent jurisdiction and regulation by both the U.S. Department of Labor and the Georgia Department of Insurance.

192. On September 6, 2002, representatives of the Georgia Department of Insurance conducted a search and seizure at the Union office at 1725 Windward Concourse, Alpharetta, Georgia.

193. On October 10, 2002, the Georgia Department of Insurance, after finding the Plan to be subject to regulation by the Georgia insurance department, asserted jurisdiction over the Plan and issued a cease and desist order ordering the Plan's

operators to cease and desist all insurance related activities in the State of Georgia.

194. Other state insurance departments had also asserted jurisdiction over the Plan and were performing investigations related to the Plan in 2002 and continuing in 2003 and 2004. These included the state insurance departments for Arkansas in November 2003, Florida in May 2003, Illinois in November 2003, North Carolina in July 2003, and, as noted above, Texas in January 2002.

195. Based upon complaints being lodged with the U.S. Department of Labor by many of the Plan participants, the Department of Labor began an investigation of the Plan and of the Union.

196. On April 26, 2004, the Court, in the related case <u>Chao v. International Union of Industrial and Independent Workers, et al.</u>, No. 1:04-CV-0943-Martin (the "<u>Chao</u> Case"), entered an Order and Consent Decree appointing Jeanne Bryant as Independent Fiduciary of the Plan and substituting her for the Trustees of the Plan for a period of forty-five days and for such additional time as that court directed.

197. On September 7, 2004, the Court in the <u>Chao</u> Case entered a Preliminary Injunction appointing Jeanne Bryant as Independent Fiduciary of the Plan and substituting her for the

Trustees of the Plan "with plenary authority to administer the [Plan] and its assets and to implement its orderly termination."

198. In accordance with the September 7, 2004 order in the Chao Case, Independent Fiduciary terminated the Plan effective October 1, 2004.

L.   Outstanding Unpaid Claims

199. The Fiduciary estimates that presently the Plan presently has aggregate unpaid and outstanding claims of approximately $9.2 million that remain unpaid because of the wrongful, improper, and/or negligent actions of the Defendants.

### V.   **Claims**

A.   Breach of Fiduciary Duty by Consultants/Enrollers.

200. Fiduciary incorporates and adopts the allegations set forth in Paragraphs 1-199 above as if the same were fully set forth herein.

201. The Consultants/Enrollers were agents of the Plan and owed fiduciary duties to the Plan because they sought Plan participants by marketing and selling the Plan as health insurance to such participants and because they were assigned the task of performing the underwriting function for the Plan.

202. The Consultants/Enrollers breached the fiduciary duties they owed the Plan by acting as insurance agents and salesmen of the Plan instead of acting as Union representatives

and recruiters and ensuring that only employees of employers who had entered into valid collective bargaining agreements were made members of the Plan.

203. The Consultants/Enrollers also breached their fiduciary duties to underwrite the Plan by signing up any and all members, including beneficial members, without any discrimination as to characteristics that an underwriter would normally perform.

204. These breaches of fiduciary duty by the Consultants/Enrollers were the direct and proximate cause of and resulted in the Plan failing because the health insurance Plan collapsed and became more deeply insolvent from being confronted with high and ballooning claims in comparison to insufficient funds to pay such claims.

B.   Negligence

205. Fiduciary incorporates and adopts the allegations set forth in Paragraphs 1-204 above as if the same were fully set forth herein.

206. The Consultants/Enrollers negligently failed to perform duties owed to the Plan.

207. The Consultants/Enrollers owed duties to the Plan to perform the underwriting for the Plan to ensure that high-risk participants were not allowed in the Plan and also owed a duty

to Plan participants whom they placed in the Plan to ensure that the Plan was a valid Plan with sufficient financial status to pay claims as promised to such Plan participants.

208. The Consultants/Enrollers breached those duties by enrolling any and all Plan participants, including beneficial members, without ensuring that the Plan was a legitimate Union-sponsored Plan that had sufficient financial status to pay claims as it promised to do and without any performance of any functions that an underwriter would normally perform, such as determining the age or major or chronic medical condition of potential Plan participants.

209. The breaching of these duties to the Plan caused damages to the Plan of the unpaid outstanding claims that exist because funds would have been available and those claims would have been paid had the Plan been properly underwritten or those now unpaid claims would never have been incurred had the Consultants/Enrollers refused to deal with the sham IUIIW.

C.  Negligent and/or Fraudulent Misrepresentation to the Plan and Plan Participants.

210. Fiduciary incorporates and adopts the allegations set forth in Paragraphs 1-209 above as if the same were fully set forth herein.

211. The Consultants/Enrollers committed negligent or fraudulent misrepresentation by negligently or intentionally making false statements to existing and future Plan participants that the Plan participants reasonably and justifiably relied upon in joining the Plan and/or remaining in the Plan and that caused damages to the Plan and its participants.

212. The Consultants/Enrollers each made representations of fact to existing and future Plan participants that the Plan was financially able to provide them with the health insurance coverage and benefits set forth in the Plan's Summary Plan Description and other documents including benefits information packets in exchange for the payment of the required premiums and alleged Union dues.

213. These representations made by the Consultants/ Enrollers to Plan participants were untrue when they were made because the Plan was not financially able to provide Plan participants with the health insurance coverage and benefits set forth in the Plan's Summary Plan Description and other documents including benefits information packets.

214. The Consultants/Enrollers knew or should have known that such representations to the Plan participants were false through the exercise of reasonable care on their parts to learn that Plan participants' claims were not being paid and that the

Plan did not have monies sufficient to make such payments of such claims on an ongoing basis, and were negligent in making such false representations to Plan participants without first learning whether the Plan had the financial ability to provide the health insurance coverage and benefits that the Plan represented it could and would provide.

215. The untrue statements and representations made by the Consultants/Enrollers regarding the Plan's financial ability to provide the stated health insurance coverage and benefits were made to induce existing members to continue paying monies to the Plan and Union and to induce potential members to join the sham Union and Plan so that their monies could be paid to the Union and Plan and then distributed to the Consultants/Enrollers.

216. Plan participants acted in justifiable reliance on such false representations made by the Consultants/Enrollers in making payments or authorizing payments to be made to the Plan.

217. The Plan and its participants were harmed because the participants' claims were not paid and the insolvency of the Plan deepened.

218. The Consultants/Enrollers, through the presentation of a new participant to the Plan, each made representations to the Plan that the new participant was appropriately qualified for

Plan participation and that adequate underwriting efforts had been applied to the new participant.

219. In many cases, the new participants were known to the Consultants/Enrollers to be individuals who were not part of appropriate employee groups, individuals who were not working pursuant to collective bargaining arrangements, and individuals who had health histories that were high risk.   In those instances, the Consultants/Enrollers misrepresented to the Plan the qualification for these new participants to be enrolled into the Plan.

220. The   Plan   relief   upon   the   Consultants/Enrollers' representation that a new participant was qualified for enrollment and accepted those individuals as participants which, in turn, led to numerous high cost claims being lodged with the Plan for payment, which, in turn, contributed to the insolvency or the deepening of the insolvency the Plan now faces.

D.   Aiding and Abetting Fiduciary Breaches Under Common Law and
     ERISA Section 502

221. Fiduciary incorporates and adopts the allegations set forth in Paragraphs 1-220 above as if the same were fully set forth herein.

222. The   Consultants/Enrollers,   IUPIW,   IUPIW   Canadian Benefit Fund, and George Beltz aided and abetted the breaches of

fiduciary duty by the Plan's Trustees, causing damages to the Plan.

223. The Consultants/Enrollers, IUPIW, IUPIW Canadian Benefit Fund, and George Beltz knew that the Plan Trustees' conduct in failing to properly operate the Plan constituted breaches of their fiduciary duties owed to Plan participants.

224. The Consultants/Enrollers, IUPIW, IUPIW Canadian Benefit Fund, and George Beltz, through agreement with one another or otherwise, gave substantial assistance or encouragement to the Trustees in doing so by taking actions that specifically allowed the Plan to offer health insurance to Plan participants while knowing that claims were not being paid and could not be paid or while knowing that claims, both actual and expected, would well out-strip assets or while knowing that premium rates were insufficient to allow the Plan to pay claims as required.

225. But for the assistance given to the Plan Trustees and/or the conspiracy to provide such assistance by the Consultants/Enrollers, IUPIW, IUPIW Canadian Benefit Fund, and George Beltz, the Plan Trustees would not have been able to breach their fiduciary duties to cause harm to the Plan participants because the Plan would not have been able to offer

63

and promise health insurance coverage and benefits to Plan participants.

226. Additionally, the Consultants/Enrollers, IUPIW, IUPIW Canadian Benefit Fund, and George Beltz assisted and/or conspired to assist each other in actions which violated or allowed the violation of law.  These aiding and abetting and conspiratorial actions range from, without limitation, the illegal perpetuation of the Union as a sham to the unlawful marketing of the Plan's health insurance to the improper diversion and use of Plan assets to themselves.

227. The aiding and abetting actions by the Consultants/Enrollers, IUPIW, IUPIW Canadian Benefit Fund, and George Beltz were the direct and proximate cause of the damages suffered by the Plan and Plan participants in an amount to be proved at trial.

E.    Federal and State Civil RICO Violations

228. Fiduciary incorporates and adopts the allegations set forth in Paragraphs 1-227 above as if the same were fully set forth herein.

229. The Consultants/Enrollers, IUPIW, IUPIW Canadian Benefit Fund, and George Beltz (each individually a "RICO Defendant" and collectively, the "RICO Defendants") violated

Section 1962(c) of RICO, 18 U.S.C. § 1962(c) and O.C.G.A. § 16-14-4(a)&(b).

230. The RICO Defendants' actions violated the unlawful conversion of Plan assets statute, 18 U.S.C. Section 664, and the mail and wire fraud statute, 18 U.S.C. Section 1341, as well as Georgia statutes making it unlawful to sell invalid or unauthorized insurance.

231. A civil racketeering, corrupt, and fraudulent enterprise was formed by the alleged Union, the Plan, and others, including the RICO Defendants, to sell health insurance as a benefit of membership in the Union when, in fact, it was known that the Union was a sham.  The real purpose of their activities was to obtain monies for payment of various persons involved with or associated with the enterprise, including the Consultants/Enrollers, IUPIW, IUPIW Canadian Benefit Fund, and George Beltz using Plan funds. The fraudulent scheme that was the enterprise allowed the RICO Defendants and others to avoid state insurance regulations that would have imposed requirements on the Plan that would have prevented the RICO Defendants and others from obtaining funds from the sale of the purported legitimate health insurance in the Plan.

232. The enterprise was engaged in or affecting interstate commerce.

233. The RICO Defendants were associated with the enterprise. Each RICO Defendant conducted or participated in this pattern and/or some portions of this pattern of racketeering.

234. The pattern of racketeering activity associated with the enterprise included the activities of (1) using the sham Union and its alleged union activities as a front to offer health insurance including to beneficial members who were not members via proper collective bargaining agreements; (2) operating the Plan as a self-funded plan while failing to ensure proper underwriting was done regarding the Plan; and (3) using the pyramid-scheme of signing up of new members for health insurance to use their money to pay for previously outstanding claims when the RICO Defendants knew that claims were not being paid, that funds were not available to pay claims, that sufficient underwriting actions had not been taken to properly set and collect rates to support the insurance program, and that sufficient accounting and actuarial analysis had not been done to support the insurance program.

235. Each RICO Defendant either 1) knowingly agreed to commit and did commit two or more predicate acts in furtherance of a common unlawful purpose or 2) with deliberate ignorance did

commit two or more predicate acts in furtherance of a common unlawful purpose.

236. The Consultants/Enrollers performed predicate acts in furtherance of the fraudulent scheme described herein each time they made representations to existing and potential Plan participants that the Plan would pay for insurance benefits in exchange for the payment of premiums and further implicitly representing that the Plan was financially sound and able to do so while knowing that the Plan, in fact, was not paying claims. The Consultants/Enrollers made these false representations orally and in writing and made such misrepresentations via the mail and wires.

237. Additional predicate acts of the Consultants/Enrollers were to sign up members and beneficial members for health insurance in the Plan. These Consultants/Enrollers did these predicate acts while knowing and/or with deliberate ignorance that the Plan was without funds to pay claims. These Consultants/Enrollers did so knowing or with deliberate ignorance as to the risks of high dollar amount claims that existed regarding the "recruited" members. These Consultants/Enrollers also did these predicate acts without any intent for the Plan to provide Union benefits to the members and without the Consultants/Enrollers performing any underwriting

function for the Plan.  But for the predicate actions of these RICO Defendants, the fraudulent scheme described herein would not have succeeded because the Plan would not have been marketed and sold to participants whose claims the Plan failed to pay and/or the Plan would have terminated well prior to October 2004 and thus would not have spiraled deeper into the insolvent state it was in as of October 2004 and it is in presently.

238. Predicate acts of IUPIW, IUPIW Canadian Benefit Fund, and George Beltz were to purport to provide fully-insured health insurance coverage to certain Plan participants in order to obtain payments of thousands of dollars of Plan assets to IUPIW and George Beltz for alleged union dues and to obtain payments of hundreds of thousands of dollars of Plan assets for alleged fully-insured health insurance premiums, when Plan assets should never have been paid for such alleged purposes.

239. The pyramid fraud scheme was continued until the Plan collapsed from the weight of claims not being paid and was not stopped by the actions of the RICO Defendants.

240. The RICO Defendants, through knowing and/or deliberate ignorant actions, contributed to and allowed the fraudulent scheme to be done because they were being compensated and they wanted to continue to be compensated.

241. None of the RICO Defendants took action to stop the Plan from performing this pyramid fraud scheme.

242. None of the RICO Defendants took action to stop the Plan from taking payments from individuals when they knew the Plan was unsound and could not pay claims and/or knew of the sham nature of the Union.

243. Instead, the RICO Defendants assisted and/or facilitated the violation by the Plan Trustees of their fiduciary duties to the Plan participants and assisted and/or facilitated the perpetration of fraud on Plan participants (e.g., the taking of fees while representing that their health claims would be paid).

244. The RICO Defendants could have refused to participate in the perpetration of the fraud on Plan participants.

245. Had the RICO Defendants refused to allow the fraud to be perpetrated on the Plan participants, the Plan would not have been able to perpetrate such fraud on Plan participants and the insolvency of the Plan would not have been deepened.

246. But for the actions of the RICO Defendants, the fraud that was perpetrated on the Plan participants would not have occurred and the Plan assets paid by the Plan participants would not have been wrongfully taken and used for purposes other than

obtaining and securing health insurance coverage for the Plan participants.

247. In addition to the fraudulent scheme described above, the RICO Defendants engaged in mail and wire fraud as the predicate acts for RICO liability because they used the United States mail in furtherance of the fraudulent scheme herein described.

248. The Plan suffered harm and damages caused by the predicate acts of the RICO Defendants.

249. The Plan lost assets that were wrongfully paid to the Defendants and lost assets that were wrongfully paid as fees to the sham Union and spent by the sham Union.

250. The damages to the Plan from the racketeering activities include the amount of outstanding unpaid claims of the Plan, which are approximately $9.2 million.

251. The Plan's damages also include the amounts paid to the Consultants/Enrollers, which was approximately $1,670,622.57.

252. The Plan's damages also include the amounts paid to IUPIW, IUPIW Canadian Benefit Fund, and George Beltz as alleged dues and premium payments, which specific amount will be proved at trial, but is in the hundreds of thousands of dollars.

70

253. The RICO violations by the RICO Defendants set forth above were the direct and proximate cause of the Plan's losses and injuries.

F.   Federal and State Civil RICO Conspiracy and Common Law Civil Conspiracy

254. Fiduciary incorporates and adopts the allegations set forth in Paragraphs 1-253 above as if the same were fully set forth herein.

255. The Consultants/Enrollers, IUPIW, IUPIW Canadian Benefit Fund, and George Beltz agreed to achieve the unlawful and illegal objectives of wrongfully converting Plan assets to their own uses and purposes in violation of 18 U.S.C. Section 664 and using the mails and wires to communicate misrepresentations to the Plan and to existing and potential Plan participants in violation of 18 U.S.C. Section 1341.

256. The Consultants/Enrollers, IUPIW, IUPIW Canadian Benefit Fund, and George Beltz each performed multiple overt acts in furtherance of their illegal and unlawful objectives of converting Plan assets to their own uses and purposes and using the mails and wires to communicate misrepresentations to the Plan and to existing and potential Plan participants.

257. The agreement and overt acts of the Consultants/Enrollers, IUPIW, IUPIW Canadian Benefit Fund, and

George Beltz caused injury and harm to the Plan and its participants because the converted Plan assets should not have been so converted and the Plan participants were harmed and injured by providing funds to the Plan for health insurance coverage that was not provided, thereby resulting in claims of the Plan not being paid.

258. The Consultants/Enrollers, IUPIW, IUPIW Canadian Benefit Fund, and George Beltz violated Section 1962(d) of RICO, 18 U.S.C. § 1962(d) and O.C.G.A. Section 16-14-4(c).

259. The Consultants/Enrollers, IUPIW, IUPIW Canadian Benefit Fund, and George Beltz violated Section 1962(d) of the federal RICO statute and O.C.G.A. Section 16-14-4(c) because, through the same actions described in Part F above and through the actions described in this cause of action, each RICO Defendant knowingly agreed to commit and/or were deliberately ignorant in their involvement in two or more predicate acts in furtherance of a common unlawful purpose, thereby conspiring to violate Section 1962(c) and O.C.G.A. Section 16-14-4(c).

260. The Consultants/Enrollers, IUPIW, IUPIW Canadian Benefit Fund, and George Beltz also committed common law conspiracy based on the actions described in this cause of action and are liable for such under Georgia law.

72

G.   Conversion.

261. Fiduciary incorporates and adopts the allegations set forth in Paragraphs 1-260 above as if the same were fully set forth herein.

262. The Consultants/Enrollers, IUPIW, IUPIW Canadian Benefit Fund, and George Beltz have intentionally exercised dominion, possession, and control over Plan assets/funds which rightfully belong to the Plan for the payment of participant claims.

263. The Consultants/Enrollers, IUPIW, IUPIW Canadian Benefit Fund, and George Beltz have converted Plan assets to their own personal use and possession. This conversion has been as to all of the supposed commissions paid to the Consultants/Enrollers. This conversion has also been as to all of the supposed dues that were taken from payments to the Plan and diverted to IUPIW and George Beltz and alleged premium payments that were taken from payments to the Plan and diverted to IUPIW, IUPIW Canadian Benefit Fund, and George Beltz.

264. The Consultants/Enrollers have taken possession of and have refused to return Plan assets/funds in an amount of not less than $1,670,622.57.

73

265. IUPIW, IUPIW Canadian Benefit Fund, and George Beltz have taken possession of and have refused to return Plan assets/funds in an amount of hundreds of thousands of dollars.

266. The Plan has been proximately damaged through these above-stated acts of conversion.

H.    Breach of Contract by the Consultants/Enrollers.

267. Fiduciary incorporates and adopts the allegations set forth in Paragraphs 1-266 above as if the same were fully set forth herein.

268. The Consultants/Enrollers were each a party to a written General Consultant Agreement with the Plan and were also each a party to an IUIIW Organizer Agreement with the Union.

269. As a result of the IUIIW Organizer Agreement of each Consultant/Enroller, an implied term in each General Consultant Agreement with the Plan was that the Consultant/Enroller would bring participants into the Union by organizing employers as Union shops, thereby providing the underwriting to the Plan by preventing adverse selection.

270. The Consultants/Enrollers each breached their respective General Consultant Agreement with the Plan by failing to properly underwrite the Plan by failing to organize employers as Union shops, but instead recruiting Plan participants as

individuals or small groups who joined the Plan as beneficial members of the Union.

271. The breaches of the General Consultant Agreements by the Consultants/Enrollers caused financial damages to the Plan in an amount to be proved at trial.

I.    Breach of Contract by IUPIW and IUPIW Canadian Benefit Fund.

272. Fiduciary incorporates and adopts the allegations set forth in Paragraphs 1-271 above as if the same were fully set forth herein.

273. IUPIW and IUPIW Canadian Benefit Fund were parties to the oral affiliation agreement with the Plan and IUIIW between June 2000 and April 2002 and the written affiliation agreement with the Plan and IUIIW between November 2002 and September 2004.

274. IUPIW and IUPIW Canadian Benefit Fund breached the oral and written affiliation agreements by failing to provide adequate consideration to the Plan in exchange for the monies paid as dues and premium payments.

275. The breaches of the by IUPIW and IUPIW Canadian Benefit Fund caused financial damages to the Plan in an amount to be proved at trial.

J.    Money Had and Received/Unjust Enrichment/Quantum Merit/
      Constructive Trust.

276. Fiduciary incorporates and adopts the allegations set
forth in Paragraphs 1-275 above as if the same were fully set
forth herein.

277. The Consultants/Enrollers, IUPIW, IUPIW Canadian
Benefit Fund, and George Beltz all received money that belonged
to the Plan and regarding which they have no entitlement to
keep.

278. In equity and good conscience, none of the
Consultants/Enrollers, IUPIW, IUPIW Canadian Benefit Fund, and
George Beltz have entitlement to the entirety of the funds so
received and all hold such funds (or portions thereof) in
constructive trust for the benefit of the Plan and the claims of
its participants.

279. In equity and good conscience, the
Consultants/Enrollers, IUPIW, IUPIW Canadian Benefit Fund, and
George Beltz retaining the amounts received by them would
constitute unjust enrichment as to those funds.

280. The Consultants/Enrollers were collectively unjustly
enriched by at least the amount of $1,670,622.57.

281. IUPIW, IUPIW Canadian Benefit Fund, and George Beltz were collectively unjustly enriched by hundreds of thousands of dollars.

282. The Plan has been proximately damaged to the amount of its assets/funds that have been had and received by these Defendants and/or to the amount that these Defendants have been unjustly enriched by retaining the amounts received by these Defendants.

## VI.  **Prayer For Relief**

WHEREFORE, premises considered, Fiduciary respectfully requests that the Court grant and award Fiduciary the following relief:

1.   Regarding Fiduciary's breach of fiduciary duty claims against the Consultants/Enrollers, Fiduciary requests that judgment be entered in Fiduciary's favor and against the Consultants/Enrollers for the damages caused by their breaches of their fiduciary duties and for all sums paid to them by the Plan, plus pre- and post-judgment interest thereon at the maximum permissible legal rate; and that the Court award Fiduciary the costs and expenses that have been incurred;

2.   Regarding Fiduciary's negligence claims against the Consultants/Enrollers, Fiduciary requests that judgment be entered in Fiduciary's favor and against the

Consultants/Enrollers for the damages caused by their negligent conduct and for all sums paid to them by the Plan, plus pre- and post- judgment interest thereon at the maximum permissible legal rate; and that the Court award Fiduciary the costs and expenses that have been incurred;

3.   Regarding   Fiduciary's   negligent   or   fraudulent misrepresentation   claims   against   the   Consultants/Enrollers, Fiduciary requests that judgment be entered in Fiduciary's favor and against the Consultants/Enrollers for the damages caused by their fraudulent conduct or negligent misrepresentations and for all sums paid to them by the Plan, plus pre- and post- judgment interest thereon at the maximum permissible legal rate; and that the Court award Fiduciary the costs and expenses that have been incurred;

4.   Regarding   Fiduciary's   aiding   and   abetting   claims against the Consultants/Enrollers, IUPIW, IUPIW Canadian Benefit Fund, and George Beltz, Fiduciary requests that judgment be entered   in   Fiduciary's   favor   and   against   the   Consultants/ Enrollers, IUPIW, IUPIW Canadian Benefit Fund, and George Beltz for the damages caused by their aiding and abetting conduct and for all sums paid to them by the Plan, plus pre- and post-judgment interest thereon at the maximum permissible legal rate;

78

and that the Court award Fiduciary the costs and expenses that have been incurred;

5. Regarding Fiduciary's federal and state civil RICO claims, Fiduciary requests that judgment be entered in Fiduciary's favor and against the Consultants/Enrollers, IUPIW, IUPIW Canadian Benefit Fund, and George Beltz, jointly and severally, for the damages caused by their violations of the RICO statute and for all sums paid to them by the Plan, plus pre- and post- judgment interest thereon at the maximum permissible legal rate; that the Court award Fiduciary her attorneys' fees and award enhanced/trebled damages as allowed by relevant statute; and that the Court award Fiduciary the costs and expenses that have been incurred related to this action;

6. Regarding Fiduciary's federal and state civil RICO conspiracy and common law civil conspiracy Fiduciary requests that judgment be entered in Fiduciary's favor and against the Consultants/Enrollers, IUPIW, IUPIW Canadian Benefit Fund, and George Beltz, jointly and severally, for the damages caused by their violations of the RICO statute and for all sums paid to them by the Plan, plus pre- and post- judgment interest thereon at the maximum permissible legal rate; that the Court award Fiduciary her attorneys' fees; and that the Court award

Fiduciary the costs and expenses that have been incurred related to this action;

7.    Regarding Fiduciary's conversion claims against the Consultants/Enrollers, IUPIW, IUPIW Canadian Benefit Fund, and George Beltz, Fiduciary requests that judgment be entered in Fiduciary's favor and against the Consultants/Enrollers, IUPIW, IUPIW Canadian Benefit Fund, and George Beltz for the damages caused by their conduct and for all sums paid to them by the Plan, plus pre- and post- judgment interest thereon at the maximum permissible legal rate; and that the Court award Fiduciary the costs and expenses that have been incurred;

8.    Regarding Fiduciary's breach of contract claims against the Consultants/Enrollers, IUPIW, and IUPIW Canadian Benefit Fund, Fiduciary requests that judgment be entered in Fiduciary's favor and against the Consultants/Enrollers, IUPIW, and IUPIW Canadian Benefit Fund finding that they breached their agreements with the Plan and that those persons and entities are liable for all damages caused thereby, including a refund of all of the monies paid by the Plan to them.

9.    Regarding Fiduciary's money had and received, unjust enrichment, quantum meruit, and constructive trust claims against the Consultants/ Enrollers, IUPIW, IUPIW Canadian Benefit Fund, and George Beltz, Fiduciary requests that judgment

be entered in Fiduciary's favor and against the Consultants/Enrollers, IUPIW, IUPIW Canadian Benefit Fund, and George Beltz for the damages caused by their conduct and for all sums paid to them by the Plan and/or the imposition of a constructive trust on all such sums and any and all proceeds from such sums, plus pre- and post- judgment interest thereon at the maximum permissible legal rate; and that the Court award Fiduciary the costs and expenses that have been incurred;

10.    For Fiduciary's attorneys' fees and costs incurred in this action; and

11.    For such other relief as the Court deems appropriate.

## VII.   Demand For Jury Trial

### PLAINTIFF HEREBY DEMANDS A TRIAL BY JURY.

Respectfully submitted,

Taylor W. Jones
Georgia Bar No. 403600
JONES, JENSEN & HARRIS
1900 One Georgia Center
600 West Peachtree St., N.W.
Atlanta, Georgia  30308
Phone: 404-872-5300
Fax: 404-872-2095

81

/s/ Graham Matherne
Andrew J. Pulliam
WYATT, TARRANT & COMBS, LLP
2525 West End Ave., St. 1500
Nashville, Tennessee  37203
Phone: 615-244-0020
Fax:  615-256-1726

Attorneys for Plaintiff
Jeanne Barnes Bryant,
Independent Fiduciary of
International Union of
Industrial and Independent
Workers Benefit Fund

45281012.2